Mary Jo O'Neill, AZ Bar #005924
Andrea G. Baran, MO Bar #46520
Christopher R. Houk, AZ Bar #020843
Richard I. Sexton, PA Bar #202584
**Equal Employment Opportunity**
**Commission, Phoenix District Office**
3300 N. Central Ave., Suite 690
Telephone: (602) 640-5049
Fax: (602) 640-5009
Email: mary.oneill@eeoc.gov
       andrea.baran@eeoc.gov
       christopher.houk@eeoc.gov
       richard.sexton@eeoc.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>AN Luxury Imports of Tucson, Inc., a )<br>Delaware Corporation )<br>)<br>)<br>)<br>)<br>Defendant. )<br>) | CIV No. 4:11-cv-00617-FRZ<br><br>**PLAINTIFF EEOC'S MOTION PURSUANT TO FEDERAL RULE OF EVIDENCE 702 TO EXCLUDE THE OPINIONS AND REPORT OF CHRISTOPHER LINSCOTT** |

Plaintiff Equal Employment Opportunity Commission ("EEOC") respectfully submits the following motion to exclude the expert report, testimony, and opinions of Christopher Linscott, Director of KLK Consulting, LLC, proffered by Defendant AN Luxury Imports of Tucson, Inc. Linscott's opinions rely on flawed assumptions not based on sufficient facts or data. His opinions, testimony, or report will not assist the

1

Court in the calculation of backpay,[1] and will not assist the jury in deciding Defendant's failure-to-mitigate defense. Instead, presentation of this flawed report will likely confuse the jury, waste time, and cause undue delay. As such, the EEOC requests that Mr. Linscott's testimony, opinions, and report be excluded from trial. In the alternative, the EEOC requests an evidentiary hearing pursuant to Federal Rule of Evidence 104(a), to determine the admissibility of Linscott's opinions.

**Procedural Background**

In 2008, Joachim Bannes and Zbigniew Orlinski filed charges of discrimination against their former employer, AN Luxury Imports of Tucson, Inc. Bannes and Orlinski were Service Technicians at BMW Tucson and were subject to harassment relating to their national origins. Bannes was born in Germany, and Orlinski was from Poland. On an almost daily basis, Bannes and Orlinski faced offensive ethnic slurs, comments, and "jokes." These activities continued for months until both men were terminated when they formally complained to supervisors and/or opposed the unlawful harassment.

Bannes was earning approximately $20.00 per hour at BMW when he was fired on December 18, 2008. At BMW, Bannes worked 40 hours per week, and could occasionally earn additional money if he completed his work assignments faster because

---

[1] Linscott's opinions relate to the EEOC's back pay calculations. Linscott agreed with EEOC's calculation of Orlinski's back pay, but calculated interest slightly differently. EEOC will stipulate to Linscott's interest calculation on Orlinski's back pay. Thus, there is no dispute on Orlinski's backpay, and not need for Linscott's third opinion.

he was considered flat rate.[2]  He was unemployed for close to three months, during which time he diligently sought work by registering with Monster.com on January 9, 2009, reviewing job vacancies on Monster.com and USAJobs.com, and applying to numerous jobs. Unable to find a job in Arizona, Bannes accepted a job in Florida and incurred the expense to move there.  On March 9, 2009, Bannes started as a service technician for Capital Eurocars, in Florida, paid $20 per hour. He was promised full-time work for six weeks, but after that, his hours were cut dramatically, so that he was then working only 26-35 hours per week. Bannes left Capital Eurocars because of the reduced hours and in October 2009 started with Tires Plus, earning $15.00 per hour as a full-time Service Manager, but then was laid off the next month due to the economic downturn. Bannes diligently sought work until he started at Enterprise Leasing Company in February 2010, as a Detailer/Driver paid $8 per hour. Bannes left that position in October 2010 because he discovered that several employees were doing drugs at the facility and he felt the environment was unsafe. Due to the economic downturn in the car industry, Bannes decided to focus on his schooling full time. Since August 2011, Bannes has worked at Lowe's Home Centers, Inc., as a part-time customer service associate, paid $10.15 per hour.

   Orlinski was earning $23.00 per hour at Tucson BMW when he was fired on April 9, 2009. He was unemployed for approximately one month, during which time he sent out numerous applications for jobs. In May 2009, Orlinski accepted a service

---

[2] "Flat Rate" means the technician has a fixed number of hours he/she can bill for a particular project, even if the project is completed in less than the allotted time.

technician position with AAstro Transmission, earning $18.50 per hour, and has since held service technician positions at eight other companies:

| | | |
|---|---|---|
| September 2009 | Holmes Tuttle | $21.00 per hour |
| June 2010 | Brake Max | $19.00 per hour |
| July 2010 | Tempe Lincoln Mercury | $23.00 per hour |
| September 2010 | International Autohaus-Tempe | $25.00 per hour |
| April 2011 | AutoMedics | $25.00 per hour |
| May 2011 | Arizona Car Care Centers | $22.00 per hour |
| July 2011 | Fletcher's Tire and Auto Care | $20.00 per hour |
| August 2011 | Lawley Ford | $27.00 per hour |

On or about February 1, 2013, Defendant designated Christopher Linscott as an expert witness in the area of backpay calculation, and provided a report in which Linscott opines as to the lost earnings Bannes and Orlinski suffered following their terminations from Tucson BMW. *See* Ex. A (Linscott Report). However, the report failed to meet the standards of Rule 26(a)(2) because it lacked proper facts and data to support the opinions stated. Specifically, the report provided no facts or data to support the expert's assumption that there were jobs available to Bannes in the Tucson and Phoenix marketplace, had he not relocated to Florida. The report is devoid of any facts or data relating to the job titles, job duties, dates the alleged jobs were available, the companies at which the jobs were available, rates of pay, or qualifications for the alleged jobs. The report also did not provide any facts or data to support the expert's assumptions that Bannes could have obtained the same employment as Orlinski at Holmes Tuttle no later than September 2009. To that end, the report failed to identify what jobs were available at Holmes Tuttle, when the jobs were available, or how much the jobs paid.

4

At EEOC's request for information about how Linscott reached his conclusions, he submitted a supplemental report on Feburary 12, 2013 with some additional facts, but no changes in the calculations, assumptions, or final values. *See,* Exs. B (Letter dated 2/5/13), C (Linscott Supplemental Report). As discussed below, the supplemental report still relies on improper assumptions and is based on sheer speculation, unsupported by actual facts or data.

**I.  The Opinions Offered by Defendant's Expert Witness**

**A.  Christopher Linscott's Data**

Linscott's first report, dated February 1, 2013, lists basic facts about Bannes, such as start and termination dates at BMW Tucson, weekly hours, hourly wages, and period of lost earnings. *See* Ex. A. Using this information, IRS interest rates, and "assumptions" about Bannes's ability to find work, Linscott calculated back pay in two scenarios for Bannes. *Id*. Linscott based his Scenario I calculation on the faulty assumption that once Bannes found employment in Florida on March 9, 2009, he fully mitigated his damages and back pay was cut off permanently, regardless of any subsequent events. *See* Ex. A; Ex. D (Linscott Deposition) 25:17-27:4; 30:21-31:6; 33:9-33:25. Linscott also relied on the faulty assumption that Bannes was full-time at Capital Eurocars, and he acknowledged that it could make a difference in his calculations if Bannes was not full time. *Id*. at 25:17-27:4. The second scenario is expressly based on Linscott's "assumption" that Bannes could have found a job within nine months, if he stayed in Tucson. *Id*. Linscott conducted no independent market

research to make this assumption and he fails to identify any data to support his assumption.

In the supplemental report dated February 12, 2013, Linscott added some basic data on the auto mechanic jobs that Orlinski obtained, which Linscott asserts are relevant to Bannes on the theory that if Bannes had remained in Arizona, he could have obtained the same jobs as Orlinski. *See* Ex. C. Linscott then used Orlinski's employment dates to justify the time period for Scenario 2. Linscott did not, however, do any independent research on auto mechanic jobs available in the Tucson or Phoenix areas.  Nor did Linscott review the job requirements for the jobs Orlinski obtained, to determine whether Bannes was actually qualified for any of those positions. Ex. D, 34:22-38:17. Linscott ignores the fact that Orlinski had close to thirty years of experience as a mechanic when he applied to Holmes Tuttle, while Bannes had less than half of that experience. *Compare* Ex. E (Orlinski Deposition) 15:8-21, *with* Ex. F (Bannes Resume). *See also* Ex. D, 37:19-41:6. Linscott also failed to recognize that Holmes Tuttle specializes in luxury cars, a specialty area in which Orlinski had spent his entire career and had three times the experience of Bannes. *See* Ex. D, 37:19-41:6; Ex. E, 15:8-21.

**B. Christopher Linscott's Opinions**

Using the flawed assumptions discussed above, Linscott expressed three opinions regarding backpay for Bannes and Orlinski:

1.	In Scenario 1, Linscott opines that Bannes should be paid $10,593 in back pay. This opinion was based on the incorrect assumption that Bannes was a full-time

6

employee at Capital Eurocars. Pay records from Capital Eurocars show that Bannes's hours were slashed in August and September of 2009, and that he rarely worked 40 hours a week. *See* Ex. H. Furthermore, Linscott failed to take into account the temporary nature of Bannes's full-time employment at Capital Eurocars. Ex. G (Payroll change notice) (guaranteeing 40 hours a week for only six weeks). Linscott's calculation also fails to account for the expenses Bannes incurred in moving to Florida for the job.

      2.      In Scenario 2, Linscott opines that Bannes should be paid $20,016 in back pay, assuming that Bannes could have found comparable employment in the Tucson or Phoenix area by September 2009, when Orlinski was hired at Holmes Tuttle at $21 per hour. Linscott incorrectly assumes, however, that Bannes and Orlinski have the same experience and skill set, and that Bannes was just as qualified for the position at Holmes Tuttle as Orlinski, despite the large disparity in experience between the two. *See* Ex. D, 37:5-40:9. Also, in concluding that Bannes could have found a job in September 2009 when Orlinski was hired at Holmes Tuttle, Linscott makes the faulty assumption that because Holmes Tuttle was hiring, there must have been other jobs available in the area. But when deposed, Linscott could not point to any facts or data to support that assumption, and admitted "I did not do any other specific research into available positions three years ago, during this time period." Ex. D, 43:19-45:22; 45:3-10. Linscott also admits that he has no knowledge about what positions were available during the relevant time frame for which Bannes was qualified. *Id*.

3.     Lincott opines that Orlinski should be paid $26,473 in back pay based on when he found new employment at Holmes Tuttle, earning more than he earned while working for Defendant.

**II. Legal Standard for Admitting Expert Testimony**

The Court must determine preliminary questions concerning the qualifications of a person to be a witness and the admissibility of evidence. Fed R. Evid. 104. First, expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which qualifies a witness as an expert "by knowledge, skill, experience, training, or education." Fed R. Evid. 702. The testimony can be used if:

> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) The testim*ony* is based on sufficient facts or data;
> (c) The testimony is the product of reliable principles and methods; and
> (d) The expert reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. It is the court's responsibility as gatekeeper to determine "whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 591 (1993) (holding that expert testimony is used to assist the jury, therefore it must "fit" the facts). This gatekeeper role "applies to all expert testimony," not just scientific testimony as had originally been debated. *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (holding that all specialized knowledge that might aid the jury is subject to the constraints of expert testimony).

To assess the reliability of an expert, *Daubert* provides a list of factors. These include whether the expert's technique can be or has been tested, whether the technique

8

has been subject to peer review and publication, the known or potential rate of error of the technique when applied, the existence and maintenance of standards and controls, and whether the technique has been generally accepted in the scientific community. *Daubert*, 509 U.S. at 593-95. These factors are not exclusive or dispositive; rather their application depends on the specific facts of each case. *Kumho Tire*, 526 U.S. at 150.

The gatekeeper function, in utilizing these factors, focuses on the expert's principles and methods rather than the conclusions reached. *Daubert*, 509 U.S. at 595. The methodology must use the "same level of intellectual rigor that characterizes the practices of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. As such, testimony may be excluded if there is "simply too great an analytical gap between the data and the opinion proffered." *General Electric Company v. Joiner*, 522 U.S. 136, 146 (1997) (holding that the court must omit an opinion that is not properly linked to the data). Similarly, reliance on flawed assumptions renders the expert testimony inadmissible. *Munoz v. Orr,* 200 F.3d 291, 301-02 (5th Cir. 2000). *See also Irvine v Murad Skin Research Labs.*, 194 F.3d 313, 320-21 (1st Cir. 1999) (holding that expert testimony is excluded where the expert relied on incorrect figures); *Finestone v. Florida Power and Light Co.*, 272 Fed.Appx. 761, 768 (11th Cir. 2008) (upholding district court's exclusion of experts where conclusions were based on hypotheticals and faulty assumptions that had no evidentiary support); *Gauthier v. Horace Mann Servc. Corp.*, No. 08-616, 2009 WL 3379127, at *6 (W.D. La. Oct. 16, 2009) (excluding expert report because the economic damages estimates were based on faulty assumptions and, therefore, did not apply reliable principles to fact).

While an expert may be qualified as an expert, he or she may only give an opinion that (1) is based on sufficient facts or data, (2) is the product of reliable principles and methods, and (3) is a reasonable application of those principles to the facts at issue. *Kumho Tire*, 526 U.S. at 152-53.

Further, under Rule 703 of the Federal Rules of Evidence, expert testimony should be excluded where it is based on inadmissible facts or data and the prejudicial effect of the data outweighs the benefit derived from its use. Fed. R. Evid. 703.

Finally, expert testimony, like other evidence, may also be excluded as irrelevant under Federal Rules of Evidence 401 and 402. The Ninth Circuit has extended Rule 401 to expert testimony. *Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1421 (9th Cir. 1998). In addition, the Fifth Circuit has extended both Rule 401 and 402 to expert testimony. *Dawsey v. Odin Corp.*, 782 F.2d 1254, 1363 (5th Cir. 1986) (expert testimony can be excluded pursuant to Rules 401 and 402).

Furthermore, Rule 403 denies relevant evidence that is prejudicial, misleading, cumulative, would lead to confusion, or would constitute a waste of time. Fed. R. Evid. 403. *Daubert* states that expert testimony "can be both powerful and quite misleading because of the difficulty in evaluating it." 509 U.S. at 595 (quoting Jack B. Weinstein*, Rule 702 of the Fed. Rules of Evidence Is Sound; It Should Not be Amended,* 138 F.R.D., 631, 632 (1991)). As such, the court as a gatekeeper must exercise "more control over [the admissibility of] experts than lay witnesses." *Id.*

**III.    Argument**

Linscott's opinions, testimony, and report are inadmissible because they (a) are not based on sufficient facts or data; (b) are not the product of reliable principles and methods; and (c) do not reliably apply the principles and methods to the facts of the case. As a result, Linscott's opinions will not help the trier of fact understand the evidence or determine a fact in issue.

### A.  Linscott's testimony should be excluded as unreliable.

Linscott's opinion regarding Bannes's back pay relies on flawed assumptions and faulty methodology, and thus fails to meet the reliability requirement of Rule 702. *Claar v. Burlington N.R.R.*, 29 F.3d 499, 501 (9th Cir. 1994) (the court "must ensure that any and all testimony or evidence admitted is not only relevant, but reliable").

First, with respect to Scenario 1, Linscott made the flawed assumption, based on no evidence whatsoever, that Bannes was earning a full-time wage while working at Capital Eurocars. The evidence, however, shows that Bannes was actually working less than full-time – 26 to 35 hours per week, therefore not making as much as he was making at Tucson BMW. *See* Ex. H (Pay records). Based on the incorrect assumption that Bannes was a full-time employee at Capital Eurocars, Linscott incorrectly concluded that Bannes stopped incurring lost earnings as of March 9, 2009, when he started work at Capital Eurocars. Ex. D, 25:17-27:4. Linscott admitted in his deposition that if Bannes was not working full time at Capital Eurocars that would impact the back pay calculation, *Id*, but never revised his report to reflect the actual earnings identified from Capital Eurocars.

Second, with respect to Scenario 2, Linscott's testimony and opinion are based on pure speculation that because Orlinski found work in September 2009, Bannes could have found work as well. Ex. D, 37:7-11. No analysis was given to the individual credentials and experiences of Bannes and Orlinski. Ex. D, 38:2-13, 40:24-41:24, 42:22-43:17. Instead, Linscott wrongly assumed that because they held the same position at BMW Tucson, Bannes and Orlinski were equivalent candidates. Ex. D, 37:12-24. The evidence, however, shows that Orlinski had significantly more experience than Bannes, and in particular, was far more experienced with the luxury cars serviced at Holmes Tuttle. Moreover, when Orlinski started at Holmes Tuttle in September 2009, Bannes had already found a job at Capital Eurocars and relocated to Florida. Thus, Linscott's Scenario 2 calculation is based on faulty assumptions that are contrary to the actual evidence in this case.

Furthermore, Linscott based his assumption about the jobs available to Bannes and Orlinski on incomplete information. The EEOC requested that Linscott provide "the job titles, job duties, dates the jobs were available, the companies at which the jobs were available, rates of pay, and qualifications required for the jobs." Exs. B, C. In response to this inquiry, Linscott identified only the eight positions Orlinski obtained between September 2009 and August 2011. *See* Ex. C. Linscott then admitted in his deposition that he had no knowledge or understanding of the duties and qualifications for any of the listed positions, and similarly did not consider whether Bannes had the necessary qualifications. Ex. D, 45:3-17. This methodology of determining that Bannes could have found a job because Orlinski found one is complete conjecture and unreliable.

12

Accordingly, Linscott's expert opinions based on flawed assumptions are inadmissible. *See, Munoz*, 200 F.3d at 301-02.

### B. Linscott's backpay calculations will not assist the Court in its determination of backpay.

It is well settled in this Circuit that the Court, not the jury, determines the issue of backpay. *See* Ninth Circuit Model Civil Jury Instructions 5.2 "Measures of Types of Damages" ("[i]n Title VII and ADA cases, *the court, not the jury*, determines the amount of back pay.") (emphasis added). *See also Lutz v. Glendale Union High School*, 403 F.3d 1061, 1069 (9th Cir. 2005) ( "there is no right to have a jury determine the appropriate amount of back pay under Title VII ... Instead, back pay remains an equitable remedy to be awarded by the district court in its discretion." (citing *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 415-16 (1975)).

The determination of backpay is a straightforward calculation that requires a relatively simple application of arithmetic. *See Turner v. Orr*, 759 F.2d 817, 820 (11th Cir. 1985) (describing the simple arithmetic calculation of Title VII backpay as purely ministerial in nature). Backpay represents the difference between a victim's actual earnings and the amount he would have earned absent the discrimination. *See* 42 U.S.C.A. §2000e-5(g)(1).

EEOC has provided a detailed explanation of its backpay calculation, and Defendant's expert identifies no inaccuracy in EEOC's methodology. Indeed, Linscott concedes the accuracy of EEOC calculation as to Orlinski, but quibbles with the amount of interest, stating only that he has used the same IRS interest rate used by EEOC, but

allegedly has "properly calculated interest." But Linscott fails to articulate or explain his own methodology in calculating interest, or explain how his methodology differs from that used by the EEOC. Linscott also opines that Bannes' backpay is lower than EEOC's calculation, but his opinion is based only on his flawed assumptions discussed above, not based on any identified error in the EEOC's calculation. Thus, because Linscott's arithmetic calculations of backpay differ only with respect to interest accrued, and fail to explain the differing methodology used to calculate interest, his calculations will not aid the Court in calculating backpay. Again, the backpay calculations are simple arithmetic, which the Court does not need an expert to explain.

  Linscott's opinions are also unreliable because they are based on reasoning that is contrary to law. The Fifth Circuit has stated:

> In general, back pay liability in a wrongful termination case commences from the time the discriminatory conduct causes economic injury and ends upon the date of the judgment. In other words, back pay accrues from the commencement of the discriminatory course of conduct causing financial loss until the date damages are "settled."

*Palasota v. Haggar Clothing Co.*, 499 F.3d 474, 482-83 (5th Cir. 2007). *See also Kolb v. Goldring, Inc.,* 694 F.2d 869, 874 & n.4 (1st Cir. 1982) (stating that damages are "settled" on the date of judgment, or when the plaintiff obtains a substantially equivalent position, whichever is earlier).

  Defendant cites no authority for the proposition that once a person finds subsequent employment, even a substantially equivalent position, then backpay is forever cut off. To the contrary, numerous courts have recognized circumstances under which backpay may resume after a person has found alternative employment. *See, e.g.,*

14

*EEOC v. Delight Wholesale Co.*, 765 F.Supp. 583, 588-89 (W.D. Mo. 1991) (citation omitted) (back pay may be tolled where a claimant quits a job for personal reasons, but should resume when he/she obtains another job). *See also EEOC v. Delight Wholesale Co.,* 973 F.2d 664, 670 (8th Cir. 1992) (citing *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1277 (4th Cir. 1985) (other citations omitted) ("a voluntary quit does not toll the back pay period when it is motivated by unreasonable working conditions or an earnest search for better employment); *EEOC v. Western Trading Co.*, 291 F.R.D. 615, 620 (D. Colo. 2013) (citing *Stone v. D.A. & S. Oil Well Servicing*, 624 F.2d 142, 144 (10th Cir. 1980) ("The Tenth Circuit has held that backpay is not cut off when an employee voluntary terminates employment that is not comparable to the employee's former position."); *Todaro v. Siegel Fenchel & Peddy, P.C.*, No. 04-CV-2939, 2009 WL 3150408, at *4 (E.D.N.Y. Sept. 25, 2009) (mitigation does not require person to remain in part-time job in place of full-time job).

      Linscott's calculations, however, are based on his own views that are contrary to the law. For example, Linscott testified that even if Capital Eurocars went out of business, it would have no impact on his calculation of Bannes' backpay. Ex. D, 33:9-17. Similarly, Linscott testified that there would be no impact on his back pay calculations if Bannes was terminated from Capital Eurocars in retaliation for making a complaint about discrimination. *Id*. at 33:18-25. As a result of these views, which are incorrect as a matter of law, Linscott's Scenario I calculation is based on the incorrect assumption that Bannes' lost earnings stopped accruing on March 9, 2009, when he started work at Capital Eurocars, and that any subsequent change in that employment is

irrelevant to the backpay calculation, no matter how long that employment lasted or the reasons it ended. This espoused methodology, which is the basis for Linscott's Scenario I calculation, is contrary to the legal standards this Court is obliged to follow in determining backpay in this case. Accordingly, this expert's opinions are not reliable and will not be helpful to the Court in determining backpay, and should be excluded.

### C.     Linscott's report and testimony will not assist the court or jury in determining Defendant's failure-to-mitigate defense.

Failure-to-mitigate is an affirmative defense on which Defendant bears the burden of proof. *Sias v. City Demonstration Agency*, 588 F.2d 692, 696 (9th Cir. 1978). To establish the defense, Defendant must prove both of the following elements: (1) that there were substantially equivalent jobs available for Bannes, and (2) that he failed to use reasonable diligence in seeking out those positions. *See Jackson v. Shell Oil*, 702 F.2d 197, 202 (9th Cir. 1983). "Substantially equivalent" employment is that "which affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status as the position from which the Title VII claimant has been discriminatorily terminated." *Cassella v. Mineral Park, Inc.*, No. 08-01196, 2010 WL 454992, at *5 (D. Ariz. Feb. 9, 2010) (Murguia, J.) (quoting *Sellers v. Delgado College*, 902 F.2d 1189, 1193 (5th Cir. 1990)). A Title VII claimant "need not go into another line of work, accept a demotion, or take a demeaning position . . . ." *See Ford Motor Co. v. EEOC*, 458 U.S. 219, 231-32. "The Supreme Court did recognize that claimants often take other lesser or dissimilar work during the pendency of their Title VII claims; nevertheless, 'doing so is not mandated by the statutory requirement that a

claimant minimize damages or forfeit his right to compensation.'" *Sellers*, 839 F.2d at 1137 (quoting *Ford Motor*, 458 U.S. at 231 n.14).

The inquiry into an employee's reasonable diligence must be "tailor[ed] . . . to the particular circumstances of the individual employee." *EEOC v. Pape Lift, Inc.*, 115 F.3d 676, 684 (9th Cir. 1997). *See also Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 156 F.3d 581, 591 (5th Cir. 1998) (evaluating reasonable diligence in light of individual characteristics of claimant and job market). The victim "is not held to the highest standard of diligence in his . . . efforts to secure comparable employment – 'reasonable' exertions are sufficient." *Iron Workers Local 118 v. NLRB*, 804 F.2d 1100, 1102 (9th Cir. 1986) (citations omitted). *See also Sellers*, 839 F.2d at 1139 ("To meet this burden, it has been consistently held that an employer must demonstrate that comparable work was available and the claimant did not seek it out.")

Linscott's report fails to establish either element of the defense. First, Linscott does not opine or even suggest, in his report or his deposition, that Bannes or Orlinski failed to use reasonable diligence in seeking out substantially comparable employment. Indeed, any such opinion would be belied by the facts because both Bannes and Orlinski diligently sought work, and quickly accepted other employment. Thus, the defense fails because the second element cannot be proved. Second, Linscott concedes that he has no personal knowledge about what positions were actually available and conducted no specific research into what positions were available during the relevant time frame. Ex. D, 44:5-45:22. Instead of relying on sufficient facts or data, Linscott merely made the assumption that because Orlinski got jobs after being fired by Defendant, Bannes could

17

have gotten those same jobs. *Id*. Such an assumption, however, which ignores the differing qualifications of Orlinski and Bannes, is not based on any facts or data and cannot serve as the basis for an expert opinion under Federal Rule of Evidence 702. Third, Linscott made the faulty assumption that Bannes was qualified for all the positions Orlinski obtained because they had a "similar skill set." Ex. D, 37:5-38:1. Linscott failed to appreciate, however, the significant disparity of experience between Bannes and Orlinski, particularly on luxury vehicles which were serviced at Holmes Tuttle, the September 2009 employer that Linscott uses to cut off Bannes' backpay.

In short, Linscott's report and testimony do not establish either element of Defendant's failure-to-mitigate defense. It is instead, a simple mathematical calculation of back pay based on erroneous assumptions. Because the jury will not determine backpay, this testimony about how to calculate backpay, will only confuse the jury.

**Conclusion**

Linscott's opinions rely on flawed assumptions not based on sufficient facts or data. Because backpay is decided by the Court, no expert is necessary because the calculation of backpay in this case is simple arithmetic. Linscott's report and testimony do not address either element of Defendant's failure-to-mitigate defense, and thus, will not assist the jury in deciding the defense. To the contrary, Linscott's opinions on how to calculate backpay, will be confusing when the jury will not decide backpay. Thus, Linscott's testimony should be excluded. In the alternative, the EEOC requests an evidentiary hearing pursuant to Federal Rule of Evidence 104(a), to determine the admissibility of Linscott's opinions.

DATED this 6th day of March, 2014.

        MARY JO O'NEILL
        Regional Attorney

        ANDREA G. BARAN
        Supervisory Trial Attorney

        /s/ *Richard Sexton*
        RICHARD I. SEXTON
        CHRISTOPHER R. HOUK
        Trial Attorneys

        EQUAL EMPLOYMENT
        OPPORTUNITY COMMISSION
        PHOENIX DISTRICT OFFICE
        3300 N. Central Ave., Ste. 690
        Phoenix, AZ 85012

        Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I certify that on this 6th day of March 2014, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Carrie M. Francis
Lonnie Williams
Stinson Morrison Hecker LLP
1850 N. Central Avenue, Suite 2100
Phoenix, AZ 85016
Attorneys for Defendant

/s/ *Richard Sexton*
Richard I. Sexton
Attorney for Plaintiff