# EXHIBIT A



## The KLK Consulting Group, Inc.

Litigation Support | Fraud Investigation & Prevention | Corporate Restructuring & Bankruptcy Services | Business Consulting

February 1, 2013

Ms. Carrie M. Francis
Stinson Morrison Hecker, LLP
1850 N. Central Avenue, Suite 2100
Phoenix, AZ 85004-4584

Dear Ms. Francis:

We have performed an analysis of the potential earnings loss of Joachim Bannes and Zbigniew Orlinski in relation to claims the Equal Employment Opportunity Commission ("EEOC") brought against AN Luxury Imports of Tucson, Inc. and Autonation USA Corporation ("BMW Tucson"). The following assumptions and procedures were used in the calculation of the potential earnings loss:

*Joachim Bannes*

1. Date of hire with BMW Tucson was February 15, 2007.

2. Date of termination with BMW Tucson was December 18, 2008.

3. Period of potential earnings loss is calculated as of June 30, 2012.

4. Joachim Bannes worked as a service technician (level 4) with BMW Tucson. We assume Mr. Bannes earned $20 per hour and worked 40 hours a week.

5. Potential lost earnings were calculated based on the two scenarios noted below:

   a) Scenario 1: Joachim Bannes potential lost earnings were fully mitigated on March 9, 2009 when he started working for Capital Eurocars in Tallahassee, FL.

      i. Mr. Bannes earned $20 an hour with Capital Eurocars, which is the same wage he earned with BMW Tucson.

      ii. Mr. Bannes contacted Capital Eurocars on January 8, 2009 to seek employment in Florida, approximately three weeks after being terminated by BMW Tucson.

      iii. Based on a review of Mr. Orlinski's employment history, there were jobs available in the Tucson and Phoenix marketplace that would have been available to Mr. Bannes had he not relocated to Florida. Mr. Orlinski had no gaps in his employment after being terminated from BMW Tucson. These employment opportunities were at equivalent positions and pay rates to Mr. Bannes' employment with BMW Tucson.

      iv. Mr. Bannes was a full time employee of Capital Eurocars.

      v. Mr. Bannes voluntarily resigned his position at Capital Eurocars.

      vi. Mr. Bannes appears to have been married and went on his honeymoon shortly after his voluntary resignation from Capital Eurocars.



Ms. Carrie M. Francis
Stinson Morrison Hecker, LLP
February 1, 2013
Page 2

       vii.  Mr. Bannes commenced going to school to become a physical therapist in early 2010 and was not available for full time employment.

    b)  <u>Scenario 2</u>: If Joachim Bannes had stayed in Tucson, AZ his earnings could have been mitigated no later than September 2009.

       i.  Based on a review of Mr. Orlinski's employment history, there were jobs available in the Tucson and Phoenix marketplace that would have been available to Mr. Bannes had he not relocated to Florida. Mr. Orlinski had no gaps in his employment after being terminated from BMW Tucson. These employment opportunities were at equivalent positions and pay rates to Mr. Bannes' employment with BMW Tucson.

       ii.  Zbigniew Orlinski, who was also a level 4 service technician with BMW Tucson, received a job with Holmes Tuttle in Tucson, AZ in September 2009 earning $21 per hour. We assume Joachim Bannes could have had the same employment opportunity as Mr. Orlinski.

       iii.  Joachim Bannes had the ability to mitigate earnings for the periods of January to August 2009. We assume he had an earnings potential of at least $9 per hour (based on his recent part time employment history) and had the ability to work 40 hours per week in a minimally skilled position since he was not disabled.

6.  The interest rate calculated by the EEOC uses the IRS rate for the computation of back pay. We have utilized those rates as well and properly calculated interest.

7.  No assumption regarding liability issues in this matter were made.

8.  No assumption regarding the appropriateness of alleged damages for out of pocket expenses for travel, tools or mileage were made.

<u>Zbigniew Orlinski</u>:

1.  Date of hire with BMW Tucson was January 2008.

2.  Date of termination with BMW Tucson was April 9, 2009.

3.  Period of potential earnings loss is calculated as of June 30, 2012.

4.  Zbigniew Orlinski worked as a service technician (level 4) with BMW Tucson. We assume Mr. Orlinski earned $23 per hour and worked 40 hours a week.

5.  Alleged back pay damages calculated by the EEOC related to Zbigniew Orlinski are reasonable, with the exception of the interest portion.

6.  The interest rate calculated by the EEOC uses the IRS rate for the computation of back pay. We have utilized those rates as well and properly calculated interest.

7.  No assumption regarding liability issues in this matter were made.

8.  No assumption regarding the appropriateness of alleged damages for out of pocket expenses for travel, tools or mileage were made.

Ms. Carrie M. Francis
Stinson Morrison Hecker, LLP
February 1, 2013
Page 3

### Conclusion

Based upon assumptions summarized above potential lost earnings are as follows (see Exhibit One, Exhibit Two):

1. Joachim Bannes:

    a. Scenario 1:

    | | | |
    |---|---|---:|
    | Potential lost earnings | | $9,334 |
    | Interest through June 30, 2012 | | 1,259 |
    | Total potential lost earnings | | $10,593 |

    b. Scenario 2:

    | | | |
    |---|---|---:|
    | Potential lost earnings | | $17,816 |
    | Interest through June 30, 2012 | | 2,200 |
    | Total potential lost earnings | | $20,016 |

2. Zbigniew Orlinski:

    a.

    | | |
    |---|---:|
    | Potential lost earnings (per EEOC) | $24,855 |
    | Interest through June 30, 2012 | 1,618 |
    | Total potential lost earnings | $26,473 |

We reserve the right to modify or update our report if additional information is received. Any questions regarding this report may be directed to Christopher Linscott, the testifying expert in this matter.

Sincerely,

*The KLK Consulting Group, Inc.*

THE KLK CONSULTING GROUP, INC.

Attachments:     Exhibits

# EXHIBIT B



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Phoenix District Office**

3300 N. Central Avenue, Suite 690
Phoenix, AZ  85012-2504
Intake Information Group:  (800) 669-4000
Intake Information Group TTY:  (800) 669-6820
Phoenix Status Line:  (602) 640-5000
TTY (602) 640-5072
FAX (602) 640-5009
Website:  www.eeoc.gov

February 5, 2013

Carrie M. Francis
Stinson Morrison Hecker LLP
1850 N. Central Avenue, Suite 2100
Phoenix, AZ 85016

RE:   *EEOC v. AN Luxury Imports of Tucson, Inc., et al*
      CV 11-00617-TUC-FRZ

Dear Ms. Francis:

We have reviewed the expert report dated February 1, 2013 by the KLK Consulting Group, Inc. Bates Nos. 678-87. The expert report does not comply with Rule 26 because it fails to provide "the facts or data considered by the witness in forming" his opinions. Fed.R.Civ.P. 26(a)(2)(B)(ii).  Specifically, there is no support for the following statements in the report:

**Mr. Bannes, Scenario 1:**

- Based on a review of Mr. Orlinski's (sic) employment history, there were jobs available in the Tucson and Phoenix marketplace that would have been available to Mr. Bannes had he not relocated to Florida….These employment opportunities were at equivalent positions and pay rates to Mr. Bannes' (sic) employment with BMW Tucson.  BMW678.

  Deficiency:
    o Please provide all facts and data supporting these statements including what jobs were available in the Tucson and Phoenix marketplace, the job titles, job duties, dates the jobs were available, the companies at which the jobs were available, rates of pay, and qualifications required for the jobs.

**Mr. Bannes, Scenario 2:**

- We assume Joachim Bannes could have had the same employment opportunity [at Homes Tuttle] as Mr. Orlinksi. BMW679.

  Deficiency:
    o Please provide all facts and data supporting these statements including what job openings were available at Homes Tuttle, when the jobs were available and how much the jobs paid.

- The interest rate calculated by the EEOC uses the IRS rate for the computation of back pay. We have utilized those rates as well and properly calculated interest. BMW679.

  Deficiencies:
  - Please provide documentation establishing the IRS interest rate that was used and what rate was used when.
  - Please provide documentation showing whether simple or compound interest was used and how it was applied.

**Mr. Orlinksi**

- The interest rate calculated by the EEOC uses the IRS rate for the computation of back pay. We have utilized those rates as well and properly calculated interest. BMW679.

  Deficiencies:
  - Please provide documentation establishing the IRS interest rate that was used and what rate was used when.
  - Please provide documentation showing whether simple or compound interest was used and how it was applied.

Please provide all the facts or data considered for the above statements by Monday February 11, 2013.

In addition, please provide dates for the deposition of the expert the week of March 11, 2013.


Sincerely,

/s/ Christopher R. Houk

Christopher R. Houk
Trial Attorney

# EXHIBIT C



## The KLK Consulting Group, Inc.

Litigation Support | Fraud Investigation & Prevention | Corporate Restructuring & Bankruptcy Services | Business Consulting

February 12, 2013

Ms. Carrie M. Francis
Stinson Morrison Hecker, LLP
1850 N. Central Avenue, Suite 2100
Phoenix, AZ 85004-4584

Dear Ms. Francis:

The KLK Consulting Group, LLC ("KLK") issued a report on February 1, 2013 related to a claim filed by the Equal Employment Opportunity Commission ("EEOC") against AN Luxury Imports Tucson, Inc. and Autonation USA Corporation. The purpose of this letter is to respond to questions raised by the EEOC in a letter dated February 5, 2013 regarding KLK's expert report.

The following are questions raised by the EEOC and KLK's response to each:

1.  **Mr. Bannes, Scenario 1:** Please provide all facts and data supporting these statements including what jobs were available in the Tucson and Phoenix marketplace, the job titles, job duties, dates the jobs were available, the companies at which the jobs were available, rates of pay, and qualifications required for the jobs.

    a.  *Jobs known to be available in the Arizona market include:*

        i.  *Aastro Transmission – auto technician (AG3) position available as early as May 2009 at a flat rate of $23 (Bates: AASTRO-BMW-000001-000015).*

        ii.  *Holmes Tuttle – master service technician available as early as September 2009 at $21 per hour (Deposition of Zbigniew Orlinski pages 208 – 211).*

        iii.  *Brake Max Car Care Centers – service technician available as early as June 2010 at $18 per hour (Bates: BRAKE-BMW-000001-000016).*

        iv.  *Tempe Lincoln Mercury – service technician available as early as June 2010 at a flat rate per hour of $23 (Bates: TLM-BMW-000001-000006).*

        v.  *International Autohaus – service technician available as early as September 2010 at $25 per hour (Bates: IAT-BMW-000001-000011 and Deposition of Zbigniew Orlinski page 214).*

        vi.  *AutoMedics – service technician available as early as April 2011 at $25 per hour (Deposition of Zbigniew Orlinski page 216).*

        vii.  *Arizona Car Care Centers – service technician available as early as May 2011 at $22 per hour (Bates: ACCC-BMW-000001-000009).*

        viii.  *Fletcher's Tire and Auto Service – service technician available as early as July 2011 at $23 per hour (Bates: FLETCHERS-BMW-000001-000023).*

        ix.  *Lawley Ford – automotive technician available as early as August 2011 at a flat rate of $27 per hour (Bates: EEOC-BMW-LAWLEY-00001-00007).*



An Independently Owned Member
of the RSM McGladrey

BMW-EXPERT-000002

Ms. Carrie M. Francis
Stinson Morrison Hecker, LLP
February 12, 2013
Page 2

2. **Mr. Bannes, Scenario 2:** (a) Please provide all facts and data supporting these statements including what job openings were available at Homes Tuttle (sic), when the jobs were available and how much the jobs paid. (b) Please provide documentation establishing the IRS interest rate that was used and what rate was used when. (c) Please provide documentation showing whether simple or compound interest was used and how it was applied.

   a. *Based on Zbigniew Orlinski employment history there was an employment opportunity with Holmes Tuttle as a master service technician as early as September 2009 at $21 per hour.*

   b. *Attached as Exhibit A is documentation from the US Office of Personnel Management which provides support for quarterly IRS back pay interest rates. Quarterly IRS interest rates used by KLK in calculating interest on back pay compensation are as follows:*

      i. *1st Quarter 2009 – 5%*

      ii. *2nd Quarter 2009 to 4th Quarter 2010 – 4%*

      iii. *1st Quarter 2011 – 3%*

      iv. *2nd and 3rd Quarter 2011 – 4%*

      v. *4th Quarter 2011 to 2nd Quarter 2012 – 3%*

   c. *KLK calculated interest on back pay compensation using compound interest. Attached as Exhibit B are amortization schedules prepared by KLK in calculating interest related to Joachim Bannes back pay compensation for both Scenarios 1 and 2.*

3. **Mr. Orlinski:** (a) Please provide documentation establishing the IRS interest rate that was used and what rate was used when. (b) Please provide documentation showing whether simple or compound interest was used and how it was applied.

   a. *See response at 2b above for IRS interest rates used each quarter.*

   b. *KLK calculated interest on back pay compensation using compound interest. Attached as Exhibit C is the amortization schedule prepared by KLK in calculating interest related to Zbigniew Orlinski's back pay compensation.*

Documents provided to KLK for our review of this matter are summarized in Exhibit D.

Any questions may be directed to Christopher Linscott, the testifying expert in this matter.

Sincerely,

*The KLK Consulting Group, Inc.*

THE KLK CONSULTING GROUP, INC.

# EXHIBIT D

1

1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF ARIZONA

3

4

5   EQUAL EMPLOYMENT OPPORTUNITY  )
    COMMISSION,                   )
6                                 )
             Plaintiff,           )
7                                 )
       v.                         ) Case No.
8                                 )   CV 11-00617-TUC-FRZ
    AN LUXURY IMPORTS OF TUCSON,  )
9   INC., a Delaware corporation; )
    AUTONATION USA CORP.,         )
10  a Florida corporation,        )
                                  )
11           Defendants.          )
    _____)

12

13

14

15          DEPOSITION OF CHRISTOPHER G. LINSCOTT
                    March 12, 2013
                    Tucson, Arizona
16

17

18                    Bartelt & Kenyon
              5151 East Broadway, Suite 1600
19                 Tucson, AZ 85711
                    (520) 798-3500
20

21          Reported by: Doug Kirkpatrick
             Certified Reporter No. 50705

22

23

24

25

25

1    calculation?

2         A.   I don't think on the calculation itself -- I

3    don't believe it did, no.

4         Q.   Subpoint iii, it says "Based on a review of

5    Mr. Orlinski's employment history, there were jobs

6    available in the Tucson and Phoenix marketplace that

7    would have been available to Mr. Bannes had he not

8    relocated to Florida.  Mr. Orlinski had no gaps in

9    his employment after being terminated from BMW

10   Tucson.  These employment opportunities were at

11   equivalent positions and pay rates to Mr. Bannes'

12   employment with BMW Tucson."  Do you see that?

13        A.   I do.

14        Q.   For Scenario 1 for Mr. Bannes, did that

15   subparagraph iii have any effect on back pay?

16        A.   No.  Not for Scenario 1.

17        Q.   Subparagraph iv, "Mr. Bannes was a full-time

18   employee of that Capital Eurocars."  Do you see that?

19        A.   I do.

20        Q.   Did that fact or assumption make any

21   difference on your back pay calculation for Mr.

22   Bannes in Scenario 1?

23        A.   Yes, it did.

24        Q.   What difference did that fact make?

25        A.   It stopped the damage calculation as of

26

1    March 9, 2009, when Mr. Bannes obtained full-time

2    employment at an equivalent rate with Capital

3    Eurocars.

4        Q.   Did you make the decision to stop back pay

5    at that point?

6        A.   I did.

7        Q.   And what did you base that on?

8        A.   I based it on the fact that Mr. Bannes found

9    full-time employment.  The wage was equivalent to

10   what he was earning previously with BMW Tucson.  In

11   my opinion he had fully mitigated his loss of back

12   pay at that point in time by finding an equivalent

13   position and an equivalent rate and full-time

14   employment.

15       Q.   Anything else?

16       A.   Not related to that line item.

17       Q.   Would it make a difference to you if his

18   employment at Capital Eurocars was not full time?

19       A.   It could.

20       Q.   How would that make a difference?

21       A.   I think I would want to know, if it was not

22   full time, how many hours it was.  Look at that

23   relative to the hours Mr. Bannes was working at BMW

24   to see if those were -- if there were equivalent

25   number of hours, as an example.  I would also want to

 1   know the reason Mr. Bannes was not full time, whether

 2   it was his decision or a requirement of the position

 3   on behalf of the employer.  So I think those factors

 4   would play in.

 5       Q.   I'd like to give you some hypothetical facts

 6   and ask if you could opine on how that might change

 7   your calculation.

 8            If at Capital Eurocars Mr. Bannes was told

 9   by his employer your hours are going to be reduced to

10   less than full time, less than 40 hours a week, and

11   his pay rate stayed the same at $20 an hour, and he

12   ended up working about 31 hours a week on average in

13   one month and 26 hours a week in the next month, how

14   would that affect your back pay calculation, if at

15   all?

16            MS. FRANCIS:  Object to the form.

17       A.   Well, I think in your hypothetical you have

18   to give me a time frame that we're talking about.

19   Are we talking about in the period prior to March 9,

20   2009, or -- I'm not sure what time period we're

21   talking about here.

22   BY MR. HOUK:

23       Q.   No, after August of 2009 and September of

24   2009.

25            MR. HOUK:  Why don't we mark this.

1    back pay calculation under Scenario 1 for Mr.

2    Bannes?

3            MS. FRANCIS:  Object to form.

4        A.   No.

5    BY MR. HOUK:

6        Q.   And why is that?

7        A.   One, Mr. Bannes was not a 40-hour employee

8    in his employment with BMW Tucson, certainly in the

9    last roughly six months he was there.

10           Also, I don't believe that that Capital

11   Eurocars employment and their reduction to less than

12   40 hours is related to anything associated with BMW.

13   He would have been a full-time employee for at least

14   five months with Capital Eurocars, and I -- I don't

15   see the link between a damage related to his

16   employment at BMW.

17       Q.   Is there any scenario in which you calculate

18   back pay where it might stop for a period and then

19   resume later?

20       A.   Not in this case.  I don't see it in this.

21       Q.   Can you think of any situations where it

22   might pick up after a period of stopping?

23       A.   I don't know that I can specifically see a

24   situation where someone finds a new job, they're

25   employed full-time for a relatively extended period

31

1   of time, and then damage recommences, unless it's

2   some type of, you know, seasonal type business, where

3   it was known to be a temporary position for full-time

4   employment; you know, the contract was for four

5   months or the contract was for, you know, a short

6   period of time.  But that's not the situation here.

7        Q.   You said Mr. Bannes was not a 40-hour

8   employee at BMW of Tucson.  How does that play into

9   your calculation to cut off back pay, even though he

10   worked around 32 hours in August of 2009?

11        A.   It didn't in my report.  I assumed he was a

12   full-time employee in the report that is Deposition

13   Exhibit 74.

14        Q.   So if you're assuming he was a

15   40-hour-a-week employee at BMW of Tucson, why then,

16   when it appears his hours were reduced to 32,

17   wouldn't you resume his back pay?

18             MS. FRANCIS:  Object to form.

19        A.   Because it was my opinion that he had fully

20   mitigated his damages when he was employed full-time

21   with Capital Eurocars.

22   BY MR. HOUK:

23        Q.   No, I understand that conclusion.  But I'm

24   just trying to understand why -- you gave as a reason

25   for not continuing back pay just a moment ago, when

33

1    performance-related on Mr. Bannes' part?  Was it the

2    economy in Florida that just caused that?  Did Mr.

3    Bannes go and look for alternative 40-hour employment

4    to mitigate his is damages?

5            There are many other issues that come into

6    play there, and I don't see that there's a damage in

7    your hypothetical because of that.

8    BY MR. HOUK:

9        Q.   Let's say Capital Eurocars went out of

10   business in August of 2009.  Would that have an

11   impact on your back pay calculation?

12       A.   No.

13       Q.   Because BMW of Tucson isn't the cause of

14   that?

15       A.   Correct.

16       Q.   Any other reason?

17       A.   No.

18       Q.   Let's say Mr. Bannes was terminated from

19   Capital Eurocars because he made a complaint about

20   sexual harassment.  Would that make a difference in

21   your back pay calculation?

22       A.   No.

23       Q.   And is the reason that BMW of Tucson wasn't

24   responsible for that termination?

25       A.   Correct.

34

1      Q.   The only exception where you might resume

2   back pay is if his job with Capital Eurocars was a

3   temporary position; is that a fair statement?

4              MS. FRANCIS:  Object to form.

5      A.   I think under your hypothetical, if he had

6   had a contract for short-term employment as an

7   example, you might be able to make a case that there

8   would be a back pay subsequently, but again, it would

9   depend on the facts and circumstances, whether Mr.

10   Bannes was, in the hypothetical, seeking other

11   employment.  You know, what jobs did he turn down?

12   What opportunities did he have?  How did he

13   mitigate?  Did he partially mitigate?  There would be

14   numerous factors.

15   BY MR. HOUK:

16      Q.   But outside of that situation, can you

17   envision another situation where back pay would

18   resume after it stopped?

19      A.   No.

20              MS. FRANCIS:  Object to form.

21   BY MR. HOUK:

22      Q.   Would you explain, please, how you

23   calculated back pay under Scenario 2 for Mr. Bannes?

24      A.   Under Scenario 2, I made the assumption -- I

25   made a few assumptions.

1          Scenario 2 assumes that Mr. Bannes, if he

2     had stayed in Tucson, he could have mitigated his

3     damages no later than September of 2009.  So the

4     basic premise here is outlined in Exhibit 2 to my

5     report, which is Bates 684.

6          And so, in a fashion similar to Exhibit 1,

7     there's a middle column that says "Estimated wages at

8     BMW Tucson."  And again, this has two weeks for

9     December of '08 at 40 hours a week, $20 an hour,

10    $1600.

11         And then it has the same monthly amount that

12    we went through before on Exhibit 1 for the months of

13    January through August of '09.  And that, on the face

14    of it, if I assume that he could have fully mitigated

15    in September of '09, it would be the calculation of

16    the estimated wages he would have lost from his

17    employment at BMW Tucson.

18         Secondly, what I did is, I assumed that

19    starting in January of '09 he could have found some

20    kind of temporary employment at $9 her hour.  And

21    that's in the Wage Potential column, which is the

22    $1,440.

23         So my assumption here was he could have

24    mitigated to some extent his lost wages by finding a

25    job similar to what he had in Florida, which is a

36

1    type of position at Lowe's or Home Depot, that type

2    of thing.

3            The difference between those two, which is

4    roughly $2,000 per month, is what I came up as the

5    lost wage component.  And then I calculated interest

6    on top of that.

7        Q.   Let me just recap it and make sure I

8    understand.

9        A.   Sure.

10       Q.   The middle column, where it says "Estimated

11   wages at BMW Tucson," is what Mr. Bannes would have

12   made had he not been terminated at BMW Tucson based

13   upon a 20-hour wage (sic) at 40 hours a week; is that

14   a fair statement?

15       A.   Yes, $20 per hour, 40 hours a week.

16       Q.   Correct.  You made an assumption that he

17   could have made at least $9 an hour at 40 hours a

18   week from January 2009 to August 2009, right?

19       A.   I did, yes.

20       Q.   And you subtracted that amount from what he

21   would have made at BMW of Tucson had he not been

22   terminated; is that correct?

23       A.   Yes.

24       Q.   And that resulting sum is $17,816?

25       A.   Yes.

37

1      Q.   And then you applied interest to that

2   amount?

3      A.   Yes, in the same fashion that I did with

4   Exhibit 1.

5      Q.   How did you decide to stop back pay in

6   September of 2009 for this scenario?

7      A.   If you look at page 2 of my report, under

8   Scenario 2, which is b) and then a little Roman

9   numeral ii, my assumption was that Mr. Bannes could

10   have found employment similar to what Mr. Orlinski

11   found at Holmes Tuttle.

12          Mr. Orlinski found a job with Holmes Tuttle

13   in September of '09 earning $21 per hour.  They had a

14   similar skill set, they had similar positions.  The

15   rate of $21 per hour was slightly higher than what

16   Mr. Bannes was making at BMW Tucson.  So I felt that

17   was an equivalent position and equivalent opportunity

18   and could have mitigated at that point.

19      Q.   On what did you base your statement that Mr.

20   Bannes and Mr. Orlinski had a similar skill set?

21      A.   Well, they were both service technicians at

22   BMW.  My understanding was that they did the same

23   type of work.  And that's from reading depositions in

24   the case, information.

25      Q.   Anything else?

38

1        A.    No.

2        Q.    Did you look at their history of experience

3    in working in the car industry?

4        A.    I think some of that was disclosed in the

5    depositions and that type of thing, so I had a

6    general understanding of that.

7        Q.    Would it have made a difference if you

8    learned that Mr. Orlinski was a master technician and

9    Mr. Bannes was not at that time?

10            MS. FRANCIS:   Object to form.

11       A.    From my understanding, the Holmes Tuttle

12   position was not a master service technician

13   position.

14   BY MR. HOUK:

15       Q.    What was your understanding of what that job

16   was?

17       A.    That it was a service technician position.

18       Q.    What was your understanding, if any, about

19   what kind of cars are serviced at Holmes Tuttle?

20       A.    I think they're generally Ford cars is my

21   understanding.   But I don't know in total what they

22   serve.  Holmes Tuttle is a Ford dealership is my

23   understanding.

24       Q.    Is it your understanding that it's a luxury

25   car servicing dealership?

1      A.   Not to my knowledge.

2      Q.   Is it your understanding that they service

3  primarily Lincoln-Mercurys?

4      A.   I don't know specifics.  I don't recall.

5      Q.   Would that make a difference if they

6  primarily serviced a particular type of car and Mr.

7  Bannes had little or no experience servicing that

8  type of car?

9      A.   I think it depends on the nature of the work

10  that was being done.

11      Q.   Explain that.

12      A.   I guess it depends on the specific nature of

13  what Mr. Orlinski or Mr. Bannes in this case would be

14  asked to do relative those cars in terms of the type

15  of work they would be doing, whether it translated or

16  not.

17      Q.   Did you know what type of work the position

18  at Holmes Tuttle required the service technician to

19  do?

20      A.   I don't know that I have specifics, no,

21  other than what I've read in the depositions.

22      Q.   Do you have any information at all about

23  that?

24      A.   Other than what I've read in the

25  depositions.

1        Q.    What did you learn in the depositions about

2    what the job requirements for Holmes Tuttle was?

3        A.    I think it's more general in nature.   I

4    don't think it went into specifics of what

5    specifically they were doing on the cars.

6        Q.    Do you remember looking at anything that

7    told you what the job requirements for the open

8    position at Holmes Tuttle were?

9        A.    I don't recall.

10       Q.    Would it make a difference if Mr. Bannes was

11    not qualified for any openings at Holmes Tuttle?

12       A.    Can I refer to one piece of paper that I've

13    that I have in here?

14       Q.    Sure.

15            (Pause.)

16       A.    I'm sorry, I can't find the paper I'm

17    looking for.   But go ahead and ask your questions;

18    I'll flip through.

19       Q.    The question was would it have made -- oh,

20    you found it?

21       A.    Yes.

22       Q.    Okay.

23       A.    Go ahead, I'm sorry.

24       Q.    Would it have made a difference in your

25    report had Mr. Bannes not been qualified for any open

41

1    positions at Holmes Tuttle?

2        A.   If he didn't have the skill set to do that

3    work, then he wouldn't be eligible for that

4    employment, and I'd have to look at other positions

5    that might have been available at that time.  Or a

6    subsequent time or a previous time.

7        Q.   Is there anything you can point to other

8    than what you've already mentioned that suggests that

9    Mr. Bannes had experience working on the type of cars

10   that were serviced at Holmes Tuttle?

11       A.   Well, I think the only other thing I would

12   add is that my understanding is both Mr. Orlinski and

13   Mr. Bannes were I think what's called Level 4 service

14   technicians.  It's my understanding that they had

15   similar level of qualifications.

16       Q.   And what does that mean to you?

17       A.   That they had equivalent status or

18   recognition relative to their work as Level 4.

19       Q.   At BMW of Tucson?

20       A.   Correct.

21       Q.   Is it your understanding that they

22   maintained that level of technical status at any

23   other dealership?

24       A.   I don't know what they did subsequently.

25       Q.   But you're assuming that that level for

42

1  technician status applies to Lincoln-Mercurys and all

2  other types of cars, not just BMWs; right?

3       A.   I assumed they had a similar skill set, yes.

4       Q.   For working on BMWs?

5       A.   Well, I assumed they had a similar skill

6  set, period.

7       Q.   What is your basis for that?

8       A.   That they held similar positions with BMW,

9  had similar qualifications as service technicians,

10  found similar employment, had similar pay rates.

11       Q.   Well, what's your basis for saying that they

12  had similar skill sets for working on, say, Ford

13  Lincoln-Mercurys?

14       A.   I don't think I said anything specific to

15  that type of car; I just said in general.

16       Q.   Do you have any knowledge that they might

17  have some similar skill set with regard to servicing

18  Lincoln-Mercurys?

19       A.   I don't.

20       Q.   Did you find what you were looking for?

21       A.   Yeah, that's fine.

22       Q.   Did you review the resumes of Mr. Bannes and

23  Mr. Orlinski in preparation for this report?

24       A.   If they're listed on my exhibit list, I did.

25       Q.   Do you have any recollection of doing that?

43

1      A.   I remember seeing various employment

2   applications and that type of thing.  I can't say I

3   remember seeing a specific resume.

4      Q.   Did you compare the relative qualifications

5   of Bannes and Orlinski in any way that you can

6   articulate today other than what you've already done?

7      A.   I don't think I have anything to add.

8      Q.   Do you know how many years of working with

9   cars Orlinski has versus Mr. Bannes?

10     A.   Not off the top of my head, no.

11     Q.   Well, is there anything you can refer to

12  that you relied upon in making the assumption that

13  Mr. Bannes could obtain the same type of employment

14  that Mr. Orlinski obtained?

15          MS. FRANCIS:  Object to form.

16     A.   I don't think there's anything additional I

17  could point to other than what we've talked about.

18  BY MR. HOUK:

19     Q.   Did you make an assumption with regard to

20  Scenario 2 of Mr. Bannes back pay calculation that

21  there were multiple openings at Holmes Tuttle that

22  Mr. Bannes could have been hired into?

23     A.   No, I --

24          MS. FRANCIS:  Object to form.  Go

25  ahead.

 1      A.   No, I made an assumption that there were --

 2  that there was an opportunity at Holmes Tuttle and

 3  that he could have found similar type employment.

 4  BY MR. HOUK:

 5      Q.   What similar employment was available to Mr.

 6  Bannes if Mr. Orlinski took the only position

 7  available at Holmes Tuttle?

 8      A.   Again, I don't know if there were multiple

 9  positions or one position or if there were -- I'm

10  assuming there were positions in other dealerships in

11  other places and that the Holmes Tuttle was

12  representative of the type of position that Mr.

13  Bannes could have found since Mr. Orlinski found a

14  similar type position.

15      Q.   Would it make a difference in your report if

16  there was only one position available at Holmes

17  Tuttle and Mr. Orlinski took it?

18      A.   No.

19      Q.   Why not?

20      A.   Because I see that as representative of the

21  type of positions that were available in the

22  marketplace at that point in time.

23      Q.   And what's your basis for saying that?

24      A.   My basis is that Mr. Orlinski found that

25  position and that Mr. Orlinski found many other

45

1    similar type of positions with no gap in employment

2    throughout the course of the next year or two.

3         Q.   Other than the position that Mr. Orlinski

4    was hired into, do you have any knowledge that there

5    were other positions available for which Mr. Bannes

6    was qualified?

7              MS. FRANCIS:  Object to form.

8         A.   No, I used Mr. Orlinski as an example.  I

9    did not do any other specific research into available

10   positions three years ago, during this time period.

11   BY MR. HOUK:

12        Q.   So you don't know if there were other

13   positions available at the time that Mr. Bannes was

14   looking for work, correct?

15             MS. FRANCIS:  Object to form.

16        A.   I made the assumption that there were

17   available positions.

18   BY MR. HOUK:

19        Q.   Right.  But sitting here today, can you

20   point to any position that was available other than

21   the one that Mr. Orlinski was hired into?

22        A.   I cannot.

23        Q.   Would it make a difference if there were no

24   other positions available?

25             MS. FRANCIS:  Object to form and

# EXHIBIT E

1

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF ARIZONA

3

    Equal Employment Opportunity    )
4   Commission,                     )
                                     )
5          Plaintiff,               )
                                     ) No. CV 11-00617-TUC-FRZ
6   vs.                             )
                                     )
7   AN Luxury Imports of Tucson,    )
    Inc., a Delaware                )
8   Corporation, AutoNation USA     )
    Corp, a Florida Corporation,    )
9                                    )
          Defendants.               )
10                                   )
                                     )
11

12

13

                   VIDEOTAPED DEPOSITION OF
14                 ZBIGNIEW ANDREW ORLINSKI

15

                      Phoenix, Arizona
16                    June 20, 2012
                        8:53 a.m.
17

18

19

20

    CERTIFIED COPY
21

22  Reported by:
    CARRIE SMALANSKAS
23  Registered Professional Reporter
    Certified Realtime Reporter
24  Certified LiveNote Reporter

25  Arizona CR No. 50355

15

1     A.   Yes.

2     Q.   -- proficiently?

3     A.   Yes, yes.

4          I'm sorry.

5     Q.   You were hired at BMW Tucson on January 23rd of

6     2008; is that correct?

7     A.   Yes.

8     Q.   Prior to working at BMW Tucson, had you worked

9     in any other BMW store?

10    A.   No.  I was working independent shop in Germany

11    when we -- and also in Poland when I was working with the

12    BMW cars.  And I own -- my car also was a BMW -- nineteen

13    -- probably 1993, '94.  I don't remember exactly.  And --

14    and when I was working Germany, I worked Mercedes, BMW,

15    all the German cars from the 1980 -- 1980 to 1981.

16         And also I own my private shop in Poland from

17    the 1986 to the 1990 and worked different cars, like

18    Mercedes, BMW, foreign cars.  Fiat also.

19    Q.   So prior to working at BMW Tucson, you did have

20    some experience working on BMW vehicles?

21    A.   Yes.

22    Q.   The store that you worked at right prior to

23    working for BMW Tucson, was that a Toyota dealership?

24    A.   Yes.  I was working next to -- it was next to

25    BMW.  It was Toyota store dealership.

# EXHIBIT F

7596 MONA LISA RD • #10104 • TUCSON, AZ 85741
520-609-8822 • JOACHIM.BANNES@HOTMAIL.COM

# JOACHIM BANNES

## OBJECTIVE

To acquire a position in your company that affords an opportunity for professional development, upward mobility and personal fulfillment.

## WORK OF EXPERIENCE

02/07 - 12/08, Tucson BMW, Tucson, AZ
**Auto Technician/Mechanic**
Vehicle Maintenance, Vehicle Diagnosis, Engine Repair, Performed all vehicle related repairs, Programming and updating vehicle software. Customer Service
10/05 - 02/07, Independent BMW Service, Tucson, AZ
**Auto Technician/Mechanic**
Vehicle Maintenance, Vehicle Diagnosis, Engine Repair, Performed all vehicle related repairs, Customer Service
11/04 - 10/05, European Service, Tucson, AZ
**Auto Technician/Mechanic**
Vehicle Maintenance, Vehicle Diagnosis, Engine Repair, Performed all vehicle related repairs, Customer Service
02/1996 - 08/2004
Work Experience consisted of service in the German Armed Forces for
3 years followed by employment in the German automotive industry.

## EDUCATION

01/2009, Pima Community College, General Studies
Ongoing

08/1991 - 01/1996, Handwerkskammer Trier, Vocational Trade School
Apprenticeship diploma.

07/1991, GHS Trier - Zewen, Trier - Zewen, Germany
High School Diploma

## LANGUAGES

English
German

## REFERENCES

**Available upon Request**

CE-BMW-000005

# EXHIBIT G

# Payroll Change Notice

Date **3-6-09**   I.D. # _____   Social Security # _____

Name **JOACHIM BARNES**   Title _____   Classification **F/T**

Street Address _____

City / State / Zip _____   Phone ( ___ ) _____

Division _____   Department _____   Shift _____

Check appropriate box:

- [x] Enter On Payroll
- [ ] Change Rate
- [ ] Remove From Payroll
- [ ] Change Title / Classification to: _____
- [ ] Change status to:   [ ] Full Time   [ ] Part Time   [ ] Temporary
- [ ] Leave of Absence   Paid?   [ ] Yes   [ ] No   [ ] Return   Date of return to work _____
- [ ] Address / Information Change: _____

- [ ] Transfer to: *(Department)* _____
- [ ] Change Shift to: _____
- [ ] Change Withholding Rate (complete new W-4 form)

Date Effective **3-9-09**   Hour _____

Old Rate: _____   Per _____

New Rate **20.00**   Per **FRH**

Date of Last Payroll Change: _____

*GAURANTEE OF 40 HOURS*
*A WEEK FOR FIRST 6 WEEKS*

**Reason for Payroll Change**

- [ ] Merit Increase
- [ ] Promotion
- [ ] See Performance Appraisal
- [ ] Other _____
- [x] New Employee

**Reason for Termination:**  (Please complete Exit Interview form)

- [ ] Voluntary
- [ ] Laid Off
- [ ] Discharged
- [ ] Other

Remarks: _____
_____
_____

Submitted By: _____   Title **SUC DIR.**   Date **3-6-09**

Approved By: _____   Title _____   Date _____

HRdirect ©   Item # 400 6.8   To reorder call HRdirect toll free at 1-800-346-1231.   © Copyright 1992, 1998, Executive Greetings, Inc.

CE-BMW-000018

# EXHIBIT H

**5 Year Historical Earnings**                                              02/22/10 11:09:30

| | Monthly Earnings - Last 2 Years | | | Annual Earnings - Last 5 Years | |
|---|---|---|---|---|---|
| | 2010 | 2009 | | | |
| Jan | | | | 2010 | 0.00 |
| Feb | | | | 2009 | 20,586.50 |
| Mar | | 2,850.00 | | 2008 | 0.00 |
| Apr | | 3,884.60 | | 2007 | 0.00 |
| May | | 1,829.58 | | 2006 | 0.00 |
| Jun | | 3,400.10 | | | |
| Jul | | 3,738.60 | | | |
| Aug | | 2,559.00 | | | |
| Sep | | 2,070.00 | | | |
| Oct | | 254.62 | | | |
| Nov | | | | | |
| Dec | | | | | |

Cycle   0635 Open   *Data as of Cycle 0634

Employee#   997672   Name  BANNES, JOACHIM              SSN  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



| F1 Help | F2 | F3 | F4 | F5 | F6 |
|---|---|---|---|---|---|
| F7 Previous Screen | F8 Next Screen | F9 | F10 | F11 | F12 |

| | Record Viewed | PAYDH000 | NEITZELO | 30P002 | Y68/Z68 | OVR | |

CE-BMW-000017